**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

DEC 1 3 2017

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

WINKAL MANAGEMENT, LLC,　　　　)
　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　v.　　　　　　　　　　　　　 )　　Civil Case No. 10-83 (RJL)
　　　　　　　　　　　　　　　　)
FEDERAL DEPOSIT INSURANCE　　　 )
CORPORATION,　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　　)

## MEMORANDUM OPINION

(December 13, 2017) [Dkts. ## 33, 34]

Winkal Management, LLC ("plaintiff" or "Winkal") brings this action against the

Federal Deposit Insurance Corporation ("defendant" or "FDIC") in its capacity as the

Receiver for now-defunct Washington Mutual Bank ("WaMu"). Winkal seeks

compensation under 12 U.S.C. § 1821 for damages it allegedly suffered when the FDIC

repudiated a lease agreement between Winkal and WaMu and turned the leased property

("Premises") back over to Winkal in a state of disrepair. *See* First Am. Compl. [Dkt. # 15].

Currently before the Court are the parties' cross-motions for summary judgment.

*See* Dkts. ## 33, 34. Upon consideration of the parties' submissions and the entire record,

Winkal's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART

without prejudice, and the FDIC's Motion for Summary Judgment is GRANTED IN PART

and DENIED IN PART. In particular, I conclude that Winkal is entitled to summary

judgment on its "unpaid rent" claim for the expenses associated with repairing the

Premises. The particular amount of damages owed to Winkal, however, remains an open

question, and I thus deny Winkal summary judgment on the issue of damages without prejudice. With respect to the FDIC's summary judgment motion, I conclude that the FDIC has shown, under 12 U.S.C. § 1821, that it is entitled to prevail on Winkal's claims for "Landlord's Work" expenses and the costs to complete WaMu's "Tenant's Work."

## BACKGROUND

### A. The Winkal-WaMu Lease

On December 17, 2007, Winkal entered into a ten-year lease agreement (the "Lease") with WaMu for commercial retail space at a property located in San Gabriel, California. *See* Decl. of Richard Yarmy ("Yarmy Decl.") [Dkt. # 34-3] Ex. A ("Lease"). The Lease contemplated that WaMu would lease the Premises from Winkal for the purposes of operating a bank branch. Lease art. I, § 3. The Lease set forth the mutual rights and obligations of Winkal and WaMu, as well as provisions governing the rent due to Winkal from WaMu. Three portions of the Lease are particularly relevant here.

First, in Article XXV of the Lease, Winkal agreed to perform certain "Landlord's Work" prior to turning over the property to WaMu. Specifically, Winkal agreed to: 1) install a new roof; 2) install a new HVAC system; and 3) resurface the parking lot. *Id.* art. XXV. Winkal completed its Landlord's Work at a cost of $130,633 and granted WaMu possession of the Premises in May 2008. Yarmy Decl. ¶¶ 4-6.

Second, Article VI of the Lease establishes Winkal's and WaMu's obligations with respect to "Maintenance and Repair of the Premises." Lease art. VI. The provision specifies that "[a]s additional rent and at the sole cost and expense of Tenant, Tenant shall at all times keep all parts of the Premises . . . in suitable condition for Tenant's conduct of

2

business and in good order, good condition and good repair." *Id.* The provision further vests WaMu with the responsibility to "permit no injury to the Premises" and, "at its own cost and expense, replace as necessary all systems, appurtenances, equipment and components on the Premises which may be broken or damaged." *Id.* Finally, the provision states that at the "expiration or earlier termination of the Term, Tenant shall surrender the Premises . . . in as good condition as the same is on the Commencement Date" with "reasonable wear and tear excepted." *Id.* In short, Article VI of the Lease obligates WaMu, with limited exceptions, to maintain and repair the Premises.

Third, in a section of Article VII entitled "Alterations and Improvements," the Lease contains provisions governing any "Tenant's Work" that WaMu elected to perform. *Id.* art. VII, § 2. The provisions specify that WaMu, as tenant, "shall bear the expense of all permits, alterations and improvements which are necessary in order to make the Premises suitable for Tenant's occupancy and use before and during the Term." *Id.* Article VII further specifies that WaMu "shall commence and thereafter complete with due diligence, all of Tenant's Work," cause such work "to be done in a good and workmanlike manner," and "obtain and furnish Landlord at Tenant's expense all certificates and approvals with respect to Tenant's Work." *Id.*

## B. WaMu's Commencement of "Tenant's Work" and Subsequent Receivership

In anticipation of its occupancy, WaMu contracted with an architectural firm to develop plans for WaMu's "Tenant's Work" on the Premises. *See* Decl. of Donald J. Rethman ("Rethman Decl.") [Dkt. # 34-4] ¶ 3. The planned work included, among other things, the addition of new bathroom facilities, storage areas, administrative offices, and a

sprinkler system; upgrades to the floors, doors, and lighting; and complete replacement of all plumbing and electrical and mechanical systems. *Id.* ¶ 5. Pursuant to the "Tenant's Work" provision of the Lease, Winkal approved WaMu's proposals for the work on the Premises. *See* Yarmy Decl. ¶ 8.

Following approval of the "Tenant's Work" plans, WaMu contracted with Metro Construction Company to complete the planned construction activities. *See* Decl. of George Lomeli ("Lomeli Decl.") [Dkt. # 34-5] ¶¶ 3-4. The agreement projected that the work would cost $547,170 in total. *Id.* ¶ 5. Metro Construction commenced construction on the Premises toward the end of August 2008 and immediately began demolition work to prepare the Premises for the planned additions and renovations. *Id.* ¶¶ 6-7. A little over one month after Metro Construction began work, however, WaMu directed the company to stop all construction activities. *Id.* ¶ 7. Although Metro Construction never completed the full scope of the "Tenant's Work," the company did receive over $200,000 from WaMu for the work it performed in August and September of 2008. *Id.* ¶¶ 8-9; *see* Lomeli Decl. Ex. B.

WaMu's stop-work order to Metro Construction was not a coincidence: The now-defunct bank was in the process of entering into receivership. On September 25, 2008, the FDIC was appointed WaMu's Receiver and assumed responsibility for WaMu's financial dealings and contracts. *See* Compl. Ex. 2 [Dkt. # 1-2]. WaMu never opened for business on the Premises. Yarmy Decl. ¶ 9.

## C. The FDIC's Surrender of the Premises and Repudiation of the Lease

In late January 2009, the FDIC, acting in its capacity as Receiver for WaMu, surrendered the Premises to Winkal. *Id.* ¶ 10. A few months later, the FDIC exercised its statutory authority to repudiate the Winkal-WaMu Lease. Yarmy Decl. Ex. H; *see* 12 U.S.C. § 1821(e).

Not surprisingly, considering that Metro Construction had already performed over $200,000 worth of demolition and preparation work on the Premises, the evidence demonstrates that the Premises was in a state of disrepair when surrendered. Yarmy Decl. ¶¶ 8-11; Decl. of David Mouck ("Mouck Decl.") [Dkt. # 34-6] Ex. A, at 7.[1] According to David Mouck, a contractor who was involved in repair work on the Premises, "[a]ll interior walls, flooring, ceilings, thermal insulation, plumbing, electrical, and HVAC ducting had been removed" from the Premises and the concrete floor had been partially excavated. Mouck Decl. Ex. A, at 7. In order to make the Premises safe and ready to be occupied by another tenant, Winkal hired various contractors to repair and restore the Premises. *Id.* at 7-8; *see also* Yarmy Decl. Ex. I ("Proof of Claim"). Contractors performed that work between June and September 2009. Yarmy Decl. ¶ 11. In all, Winkal alleges that it paid $101,046.85 to finance the required repair and restoration work. *Id.*

---

[1] The FDIC unconvincingly disputes that the Premises was in a state of disrepair when turned over to Winkal, going so far as to argue that the Premises was in *better* condition than when WaMu took possession because "a significant amount of Tenant Work had taken place." Opp'n of FDIC to Pl.'s Mot. Summ. J. ("FDIC Opp'n") [Dkt. # 36] 20; *see also id.* at 20-21. That FDIC argument ignores that the key portion of the completed Tenant's Work was *demolition* work – a fact entirely consistent with the evidence that Winkal inherited a Premises in a "state of destruction." Pl.'s Reply 11; *see also, e.g.*, App. to FDIC Opp'n [Dkt. # 36-3] 22 (Habben's Home Inspections Report) ("Much work will be needed to return this property to rentable condition, most notably is the electrical service and plumbing, along with slab repairs.").

In June 2009, Winkal entered into a lease with a company called Nails Supply House, Inc. ("Nails Supply"). *Id.* ¶ 12. In addition to the construction work contracted and paid for by Winkal, Nails Supply also performed work to restore and repair the Premises. *Id.* ¶ 13. According to Winkal, that work, which included ceiling and door installation, painting, and fire sprinkler installation, cost $86,352.95 in total. *See* Winkal Statement of Material Facts ("Winkal SOMF") ¶¶ 37-39. Together, the completed repair work restored the Premises to "a baseline level"; it did not produce the upgraded Premises contemplated by the scope of WaMu's original "Tenant's Work" plans. Yarmy Decl. ¶ 18.

### D. Winkal's Proof of Claim and Judicial Action

In mid-2009, as it was performing work to restore the Premises, Winkal filed a Proof of Claim with the FDIC. *See* Proof of Claim. The Proof of Claim sought a total of $427,499.33 from the FDIC, which comprised: 1) $50,655.33 in "[u]npaid rental due under the lease through the date of [the] Notice of Lease Repudiation"; 2) $130,633 in "[a]ctual direct compensatory damages in the form of out-of-pocket costs incurred by Winkal" to "prepare space for tenant occupancy" – that is, the amount Winkal spent to perform its "Landlord's Work"; and 3) $246,211 in "[a]ctual direct compensatory damages caused by the Tenant as a result of its partial demolition of the leasehold property which the Landlord is now required to correct and/or restore." Proof of Claim Ex. A.

In November 2009, the FDIC issued its decision on Winkal's Proof of Claim. The FDIC accepted and paid Winkal's claim for $55,655.33 in "unpaid rental," but denied Winkal's "Landlord's Work" claim and its claim for expenses required to "correct and/or restore" damage caused by WaMu's demolition of the Premises. *See* Yarmy Decl. Ex. J;

6

Pl.'s Mot. Summ. J. Ex. 5 [Dkt. # 34-7]. As a basis for its denial, the FDIC explained that Winkal's claimed expenses were either associated with work Winkal was required to perform under the Lease, or represented categories of damages that are not recoverable under the relevant statutory provisions. *See* Pl.'s Mot. Summ. J. Ex. 5, Answers of FDIC to Winkal's Interrogs. 1-4.

On January 15, 2010, Winkal sued in this Court to challenge the FDIC's denial of its claims. *See generally* Compl. [Dkt. # 1]. In its First Amended Complaint, Winkal asserts three claims—one for breach of contract, one for unjust enrichment, and one for promissory estoppel—each seeking damages in excess of $375,000. *See* First Am. Compl. ¶¶ 26-45. Following a lengthy stay of this case pending resolution of a related action in California, the parties completed discovery and filed the cross-motions for summary judgment currently pending before this Court.

## STANDARD OF REVIEW

### A. FIRREA

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") sets forth the FDIC's powers and duties when acting as receiver of a failed financial institution. *See* Pub. L. No. 101-73, 103 Stat. 183. As relevant here, FIRREA authorizes the FDIC to "disaffirm or repudiate any contract or lease" to which a failed institution in receivership is a party if the FDIC determines, in its discretion, that performing the obligations of the lease would be "burdensome" and that repudiating the lease would "promote the orderly administration of the institution's affairs." 12 U.S.C. § 1821(e)(1); *see Qi v. FDIC*, 755 F. Supp. 2d 195, 200-01 (D.D.C. 2010).

Winkal does not challenge the FDIC's authority to repudiate the Winkal-WaMu Lease. This case instead concerns the extent of the FDIC's liability for its repudiation. Under FIRREA, courts determine a party's available damages not by applying "ordinary contract principles," but instead by looking to FIRREA's detailed regime governing the FDIC's repudiation liability. *MCI Commc'ns Servs., Inc. v. FDIC*, 808 F. Supp. 2d 24, 28 (D.D.C. 2011).

The legal questions in this case center around two subsections of FIRREA. The first is FIRREA's "general" damages provision, located in § 1821(e)(3). As relevant here, that provision states: "Except as otherwise provided in subparagraph (C) and paragraphs (4), (5), and (6), the liability of the conservator or receiver for the disaffirmance or repudiation of any contract" shall be "limited to actual direct compensatory damages." 12 U.S.C. § 1821(e)(3)(A).

Subsection (e)(3) thus points to a second relevant provision, subsection (e)(4). Subsection (e)(4) concerns the FDIC's liability for disaffirming or repudiating "a lease under which the insured depository institution was the lessee." *Id.* § 1821(e)(4)(A). It provides that the FDIC "shall not be liable for any damages (other than damages determined pursuant to subparagraph (B)) for the disaffirmance or repudiation of such lease." *Id.* Subparagraph (B), in turn, establishes the types of payments to which a "lessor" is entitled from the FDIC. Specifically, subparagraph (b) states that a lessor shall: 1) "be entitled to the contractual rent accruing before the later of the date" of the mailing of the notice of repudiation or effective date of the repudiation; 2) "have no claim for damages under any acceleration clause or other penalty provision in the lease"; and 3) have a "claim

8

for any unpaid rent, subject to all appropriate offsets and defenses, due as of the date of the appointment" of the receiver. *Id.* § 1821(e)(4)(B); *see First Bank Nat'l Ass'n v. FDIC*, 79 F.3d 362, 367 (3d Cir. 1996) (subsection (e)(4)(B) governs receiver's "overall liability for damages when it repudiates a lease").

A party seeking damages for the repudiation of a contract must first file a Proof of Claim with the FDIC requesting the relevant damages. Only after doing so may a party seek judicial review. *See Westberg v. FDIC*, 741 F.3d 1301, 1303 (D.C. Cir. 2014) (sections 1821(d)(6) and (13)(D) of FIRREA "set[] forth a standard exhaustion requirement that routes claims through an administrative review process, and withholds judicial review unless and until claims are so routed") (internal quotation marks and alteration omitted). FIRREA's exhaustion requirement is a jurisdictional one that courts "cannot excuse." *Id.* Assuming the jurisdictional prerequisites are met, courts review FIRREA damages claims de novo. *See Office & Prof'l Emps. Int'l Union, Local 2 v. FDIC*, 962 F.2d 63, 65 (D.C. Cir. 1992).

**B. Summary Judgment**

Summary judgment is proper when the pleadings and evidentiary record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "may affect the outcome of the litigation." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017) (internal quotation marks omitted). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When evaluating cross-motions for summary judgment, the reviewing court examines each motion "separately on its own merits to determine whether any of the parties deserves judgment as a matter of law." *Lee Mem'l Health Sys. v. Burwell*, 206 F. Supp. 3d 307, 322 (D.D.C. 2016) (internal quotation marks and brackets omitted). The moving party bears the initial burden of identifying the evidence that demonstrates an absence of any genuine issues of material fact. *See Celotex Corp.*, 477 U.S. at 323. Once the moving party has made that showing, the burden shifts to the nonmoving party to identify and "properly support" the "specific facts" showing that there is a genuine issue for trial. *Id.* at 324 (internal quotation marks omitted); *Anderson*, 477 U.S. at 256. The court must accept as true the evidence of, and draw "all justifiable inferences" in favor of, the party opposing summary judgment. *Id.* at 255. If the party opposing summary judgment fails to proffer relevant evidence on a material issue, the moving party may succeed on summary judgment by citing that "failure of proof." *Celotex Corp.*, 477 U.S. at 323.

## ANALYSIS

Citing FIRREA's repudiation-liability provisions, Winkal contends that it is entitled to three categories of payments from the FDIC. First, Winkal argues that it is entitled to recover its expenditures for performing the "Landlord's Work" under FIRREA's "actual direct compensatory damages" provision. 12 U.S.C. § 1821(e)(3)(A)(i). Second, Winkal seeks to recover the cost of restoring and repairing the Premises under FIRREA's "unpaid rent" provision. *Id.* § 1821(e)(4)(B)(iii). Finally, Winkal claims that it is entitled to recover the cost of completing WaMu's unfinished "Tenant's Work" under either the "actual direct

compensatory damages" provision or the "unpaid rent" provision. *Id.* § 1821(e)(3)(A)(i),

(e)(4)(B)(iii). I now discuss each of those arguments.

## A. Winkal's Claim for Performing "Landlord's Work"

Winkal first argues that it is entitled to recover $130,633 in "reliance damages,"

which represents the amount Winkal spent to perform its "Landlord's Work" in preparation

for turning the Premises over to WaMu. Winkal argues that such reliance damages are

recoverable under FIRREA's general damages provision, which allows recovery of "actual

direct compensatory damages." Mem. P. & A. Supp. Pl.'s Mot. Summ. J. ("Winkal

Mem.") 12 (quoting 12 U.S.C. § 1821(e)(3)(A)(i)). Winkal's argument would be tenable

were this Court applying ordinary contract principles. Unfortunately for Winkal, however,

FIRREA's damages regime cabins the damages Winkal may recover and ultimately

forecloses its "Landlord's Work" argument. How so?

Winkal correctly notes that FIRREA's general damages provision extends the

repudiation liability of a receiver to "actual direct compensatory damages," 12 U.S.C.

§ 1821(e)(3)(A)(i), a term that our Circuit has read to include "reliance" damages, *see*

*Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236, 246 (D.C. Cir. 1995). But

Winkal ignores that the general damages provision also makes clear that its allowance for

actual direct compensatory damages applies "[e]xcept as otherwise provided" in

"paragraph[] (4)," among other provisions. 12 U.S.C. § 1821(e)(3)(A). As discussed,

paragraph (4) is the paragraph governing the FDIC's repudiation of leases with failed

institutions as lessees. Critically, paragraph (4) specifies that a receiver "shall not be liable

for *any damages* (other than damages determined pursuant to subparagraph (B)) for the disaffirmance or repudiation of such lease." *Id.* § 1821(e)(4)(A) (emphasis added).

"'Any,' after all, means any." *Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010) (citing *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). When it comes to lease agreements of the type at issue here, therefore, FIRREA's text limits the repudiation-liability of the FDIC to *only* those damages covered by subsection (e)(4)(B). *See FDIC v. Mahoney*, 141 F.3d 913, 915 (9th Cir. 1998) ("Congress has chosen to treat every lease under the provisions of 12 U.S.C. § 1821(e)(4)."); *First Bank Nat'l Ass'n*, 79 F.3d at 367 ("[W]e construe subsection (e)(4)(B) to govern the receiver's overall liability for damages when it repudiates a lease."); *Unisys Finance Corp. v. Resolution Trust Corp.*, 979 F.2d 609, 610-11 (7th Cir. 1992) (subsection (e)(4)(A) is "explicit in cutting off the lessor's right to obtain damages for the receiver's repudiation or disaffirmance of a lease" except for specified claims); *Qi*, 755 F. Supp. 2d at 202 n.6 (It is "clear that § 1821(e)(4) alone applies" to plaintiff's claims based on repudiation of lease.). Although the damages covered by subsection (e)(4)(B) include claims for "contractual rent" and "unpaid rent," they do not include claims for other kinds of "actual direct compensatory damages"—including the reliance damages Winkal now seeks. 12 U.S.C. § 1821(e)(4)(B)(i)-(iii). Winkal's "Landlord's Work" claim for $130,633 therefore fails as a matter of law and the FDIC is entitled to summary judgment.[2]

---

[2] Our Circuit has not addressed the interplay between 12 U.S.C. § 1821(e)(3)(A) and (e)(4). *See Qi*, 755 F. Supp. 2d at 202 n.7. Winkal's primary counterargument is that (e)(4)(A) narrowly limits recovery of only those damages directly resulting from a repudiation (for example, a termination penalty), leaving (e)(3)(A)'s allowance for a broader range of compensatory damages largely intact. *See* Winkal Mem. 11-12 (citing *Pioneer Bank & Trust Co. v. Resolution Trust Corp.*, 793 F. Supp. 828 (N.D. Ill. 1992)).

## B. Winkal's Claim for Repairing and Restoring Premises

Winkal next claims that it is entitled to recover expenses associated with repairing the damage done to the Premises by WaMu and restoring the Premises to allow for occupancy by a new tenant. Winkal argues that such recovery is appropriate under the "unpaid rent" provision of FIRREA because the Lease bound WaMu to maintain the Premises as "additional rent" for WaMu's occupancy. Lease art. VI. Under that theory, Winkal seeks: 1) its out-of-pocket expenses to repair the Premises, which total $101,046.85; and 2) the $86,352.95 expended by Nails Supply to complete the necessary repairs. *See* Pl.'s Reply 14. For the reasons discussed below, I conclude that Winkal is entitled to summary judgment on the FDIC's liability under the "unpaid rent" provision, but I deny without prejudice summary judgment on the issue of Winkal's damages.

### 1. Liability

As discussed, pursuant to FIRREA's lease repudiation provisions, a lessor such as Winkal has a "claim for any unpaid rent" owed by the institution-lessee "as of the date of the appointment" of a receiver. 12 U.S.C. § 1821(e)(4)(B)(iii). In contrast to subsection

---

To begin, Winkal's contention is undermined by the fact that (e)(3)(A)'s general damages provision authorizes damages "for the disaffirmance or repudiation of any contract"—the same phrase that, according to Winkal, cabins the scope of (e)(4) to only those damages flowing directly from a repudiation. Winkal has provided no convincing reason to "abandon [the] usual presumption that identical words used in different parts of the same statute carry the same meaning." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017) (internal quotation marks omitted). I thus decline Winkal's invitation to read the same phrase more broadly in (e)(3)(A) than in (e)(4)(A).

In addition, as the Third Circuit has persuasively explained, Winkal's reading of (e)(4)(A) renders subsection (e)(4)(B)(iii) superfluous: If subsection (e)(4)(A) only precludes recovery of damages flowing directly from a repudiation, then the (e)(4)(B)(iii) "unpaid rent" exception would be unnecessary because "[s]uch unpaid rent is not a claim that stems from the disaffirmance or repudiation of the lease." *First Bank Nat'l Ass'n*, 79 F.3d at 367. That provides an additional reason to reject Winkal's proposed reading of (e)(3)(A) and (e)(4)(A). *Cf. Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) ("Our practice, however, is to give effect, if possible, to every clause and word of a statute.").

(e)(4)(B)(i)'s allowance for "contractual rent," which covers "only fixed, regular, periodic payments," courts have interpreted "unpaid rent" to encompass "claims for obligations other than the periodic monetary rent imposed by a lease." *Qi*, 755 F. Supp. 2d at 201 (internal quotation marks and brackets omitted) (quoting *First Bank Nat'l Ass'n*, 79 F.3d at 368). When determining whether a lessee's obligation falls within the scope of the "unpaid rent" provision, courts look to the lease to determine whether the obligation was "a duty assumed by the lessee as consideration for the occupation of the leased premises." *Id.* at 202. Applying that test, the "several courts that have delved into the issue have found that repair and maintenance costs qualify as 'unpaid rent' in circumstances where a tenant has assumed the duty to maintain or repair all of the leased premises, or at least the portion of the leased premises at issue." *Id.* at 205 (collecting cases); *see First Bank Nat'l Ass'n*, 79 F.3d at 368 (contractual obligation to "keep the premises in good condition and repair" and "ensure that the premises were maintained lawfully" constituted "unpaid rent" for purposes of FIRREA). Applying the same reasoning here, the Court easily concludes that Winkal is entitled to recover the money necessary to repair and restore the Premises.

Central to the analysis is Article VI of the Lease, which sets forth the parties' duties for "maintenance and repair of the premises." Lease art. VI (capitalization altered). Article VI specifies that "[a]s *additional rent* and at the sole cost and expense" of WaMu, WaMu "shall at all times keep all parts of the Premises . . . in good order, good condition and good repair." *Id.* (emphasis added). It similarly states that WaMu "shall permit no injury to the Premises," and "shall, at its own cost and expense, replace as necessary all systems, appurtenances, equipment and components on the Premises which may be broken or

14

damaged." *Id.* Finally, Article VI provides that upon "expiration or earlier termination of the Term," WaMu "shall surrender the Premises . . . in as good condition as the same is on the Commencement Date," reasonable wear and tear excepted. *Id.*

Pursuant to Article VI of the Lease, then, it was *WaMu* who took on the "duty" to maintain and keep the Premises in good order and to return the Premises to Winkal in "as good condition" as when the Lease commenced. *Qi*, 755 F. Supp. 2d at 202. WaMu did so not in a spontaneous act of corporate altruism, but "[a]s additional rent" pursuant to the plain terms of the Lease. Lease art. VI. By terminating the Lease and turning over the property in a state of disrepair, the FDIC, standing in the shoes of WaMu, breached that contractual "duty" and failed to provide part of the consideration WaMu promised "for the occupation of the leased premises." *Qi*, 755 F. Supp. 2d at 202. Therefore, under FIRREA's "unpaid rent" provision, Winkal is entitled to recover the amounts necessary to repair and restore the Premises.[3]

The FDIC's primary counterargument is that it owes no "unpaid rent" to Winkal because WaMu's obligation to surrender the Premises in as good condition as received was not "due," and thus had not accrued, at the time of the receivership. *See, e.g.*, FDIC Opp'n 6-8. That argument makes little sense when it comes to ongoing contractual obligations, such as the obligation to maintain a leased property. The FDIC asserts that ongoing contractual obligations accrue only at the end of the original contract term. Yet in the

---

[3] Contrary to the FDIC's argument, the fact that Nails Supply agreed to perform some of the necessary repair work does not excuse the FDIC from its statutory duty to pay any "unpaid rent" owed to Winkal at the time of the appointment. Indeed, as Winkal points out, the value of the work performed by Nails Supply "is a means by which to calculate" the amount of WaMu's "unpaid rent" obligation. Pl.'s Opp'n to Def.'s Mot. Summ. J. [Dkt. # 37] 11 n.8.

context of a repudiation, the appointment of a receiver necessarily occurs prior to the end of the original contract term. Thus, under the FDIC's "accrual" theory, it would be virtually impossible for a property-lessor such as Winkal to recover "unpaid rent" following a FDIC repudiation, even when a lessee-institution with a contractual obligation to maintain the leased property leaves the property in a state of disrepair. Our Circuit has previously rejected similar FDIC arguments. *See Office & Prof'l Emps. Int'l Union, Local 2 v. FDIC*, 27 F.3d 598, 601 (D.C. Cir. 1994) (fact that employees were not entitled to severance pay until termination, which followed receivership and union contract repudiation, did not mean that employees' contractual rights to severance pay had failed to accrue as of receivership). I do the same here.

2. Damages

The fact that the FDIC is liable under the "unpaid rent" provision does not answer just how much money Winkal may recover. As discussed, the FDIC's "unpaid rent" liability stems from WaMu's contractual obligations to "keep all parts of the Premises . . . in good order, good condition and good repair" and to "surrender the Premises . . . in as good condition as the same is on the Commencement Date." Lease art. VI. As such, the amount of "unpaid rent" due is the value of the work: 1) that is necessary to return the Premises to "as good condition as" it was on the Commencement Date and 2) that is chargeable to WaMu as "additional rent" under Article VI of the Lease, rather than carved out and made chargeable to Winkal under other provisions of the Lease. From those two limitations, it follows that Winkal is not entitled to recover the value of construction work for which it, and not WaMu, was responsible. Nor is Winkal entitled to recover the cost

of construction activities beyond the scope of work necessary to repair (rather than upgrade) the Premises.

Under those principles, the question of Winkal's asserted damages remains open. To begin, on Winkal's own admission, "the parties dispute a $47,507 charge from the Gill Company for reestablishing electrical service to the building and related electrical work," and Winkal thus has not pursued summary judgment on that set of expenses. Pl.'s Statement of Genuine Issues Opp'n to FDIC's SOMF 7 n.3 [Dkt. # 37-1]. In addition, and unsurprisingly given that the FDIC's liability was not settled at the time Winkal filed its motion for summary judgment, neither Winkal nor the FDIC has briefed the question of damages in a way that reflects the proper scope of the FDIC's "unpaid rent" liability. In general, Winkal has not adequately explained why certain expenses are properly categorized as necessary *repairs* under Article VI of the Lease—and thus encompassed by the "unpaid rent" provision—rather than *upgrades* contemplated by WaMu's abandoned "Tenant's Work" plans. Winkal has not clarified, for example, why it should be entitled to recover expenses associated with installing a "fire suppression system" when there was no such system on the Premises when WaMu took possession. *See* Rethman Decl. ¶ 5. The same goes for the expenses associated with bringing the building into ADA compliance. *Id.*

In short, I am not presently convinced, given the current record and briefing, that there remain no genuine issues of material fact with respect to Winkal's damages. After considering this Court's liability holding and, in particular, the issues just discussed, Winkal may file a renewed summary judgment motion addressing damages. The parties

17

may also, of course, seek to resolve the outstanding issue of damages without need for additional intervention by this Court. For now, I will deny summary judgment to Winkal on the question of damages without prejudice.

## C. Winkal's Claim for Completing "Tenant's Work"

The final category of damages Winkal seeks is $153,078.33 for hiring a contractor to complete WaMu's abandoned "Tenant's Work." Pl.'s Mem. 15. According to Winkal, that work would have resulted in a "completely upgraded Premises, including all ADA access requirements, a remodeled exterior, and all new interior improvements as required for a typical bank building." Winkal SOMF ¶ 43. Winkal argues that its "Tenant's Work" claim represents "additional 'unpaid rent'" under 12 U.S.C. § 1821(e)(4)(B)(iii).[4]

Winkal's "Tenant's Work" claim falters from the start. That is because the claim was not among the categories of claims presented to the FDIC in Winkal's Proof of Claim. Winkal concedes that FIRREA "requires a claimant to file an administrative claim with the FDIC before it seeks damages in district court." Pl.'s Mem. 7 (citing 12 U.S.C. § 1821(d)). Winkal argues that it satisfied that requirement with respect to its "Tenant's Work" claim by filing a Proof of Claim that sought "[a]ctual direct compensatory damages caused by the Tenant as a result of its partial demolition of the leasehold property which the Landlord is now required to correct and/or restore." Proof of Claim Ex. A. I disagree.

---

[4] Winkal also hints that its "Tenant's Work" claim falls within subsection (e)(3)'s allowance for "actual direct compensatory damages." That claim fails for the same reasons explained in the discussion of Winkal's "Landlord's Work" claim.

Winkal's Proof of Claim sought reimbursement for the work performed to "correct and/or restore" the Premises "as a result of" WaMu's "partial demolition of the leasehold property." *Id.* But the money spent to *correct* WaMu's demolition damage and *restore* the demolished property is the subject of Winkal's "unpaid rent" claim for expenses associated with repairing the Premises. Nowhere in the Proof of Claim did Winkal put the FDIC on notice of its intent to seek damages associated with completing the additional "Tenant's Work"—work Winkal concedes would go above and beyond the construction work necessary to "correct and/or restore" the Premises following WaMu's demolition.

Therefore, this is not a situation in which Winkal is seeking an additional "dollar amount" for "the same" claim originally filed with the FDIC. *Interlease Corp. v. FDIC*, 837 F. Supp. 1, 3 (D.D.C. 1993). It is one in which Winkal is asking this Court to award damages arising from an entirely new claim not presented to the FDIC. Such efforts are barred by FIRREA's administrative exhaustion requirement. *See Westberg*, 741 F.3d at 1303; *cf. Autumnwood Assocs. v. Resolution Trust Corp.*, No. Civ. A. 94-5961, 1995 WL 458876, at *3 (E.D. Pa. Aug. 2, 1995) (dismissing claims for failure to meet exhaustion requirement when amounts sought represented "new categories of damages" as compared to those contained in administrative claim). Accordingly, I deny summary judgment to Winkal on its "Tenant's Work" claim and grant summary judgment to the FDIC.[5]

---

[5] Because Winkal's failure to exhaust is dispositive, I do not address the validity of Winkal's "Tenant's Work" claim beyond briefly noting my skepticism. At bottom, Winkal's claim seeks to avoid its loss of "the benefit of its bargain to receive $547,170 of work to be completed on its Premises" and "greater rental [rates] for the Premises than it was later able to receive." Pl.'s Mem. 15 n.6 (emphasis omitted); Mouck Decl. Ex. A, at 6. Our Circuit and others, however, have noted that FIRREA bars recovery of those kinds of expectation damages. *See Office & Prof'l Emps. Int'l Union, Local 2*, 27 F.3d at 604; *Alltel Info. Servs., Inc.*, 194 F.3d at 1040-41.

To be sure, Winkal is not receiving the same relief to which it would be entitled were this a traditional contract case. But this half-a-loaf result is dictated by FIRREA's limitations on the FDIC's repudiation liability—limitations that, according to our Circuit, help advance Congress's "interest of maximizing the number of creditors who can recover some portion of what they are owed" by failed institutions such as WaMu. *Nashville Lodging Co.*, 59 F.3d at 241. To the extent that Congress's legislative scheme is leading to unfair or counterintuitive results, it is up to that body, not this Court, to modify it.[6]

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART without prejudice Winkal's Motion for Summary Judgment and GRANTS IN PART and DENIES IN PART the FDIC's Motion for Summary Judgment. An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[6] Winkal's amended complaint also seeks damages under the contract law doctrines of unjust enrichment and promissory estoppel. *See* First Am. Compl. Claims II–III. The purpose of FIRREA's finely wrought damages regime, however, is to "limit[] damages for repudiation to those enumerated" in the statute. *Alltel Info. Servs., Inc.*, 194 F.3d at 1039. FIRREA's scheme would be all but meaningless were a company able to sidestep those statutory limitations by asserting alternative contract law theories such as those Winkal presses. *Cf. MCI Commc'ns Servs., Inc.*, 808 F. Supp. 2d at 28, 35. I therefore reject Winkal's alternative unjust enrichment and promissory estoppel arguments.